IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

ANTHONY C. CHRIST, *et al.*,          *

                           *

    Plaintiffs,                     Civil Action No. RDB-15-3305

                           *

    v.                             *

TOWN OF OCEAN CITY,

   MARYLAND,               *

    Defendant.             *

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## **MEMORANDUM OPINION**

In 2015, Defendant Ocean City, Maryland ("Ocean City" or "the City") enacted a set of regulations ("the New Ordinance") that govern where, how, and when individuals may perform on certain areas of the Ocean City boardwalk. The New Ordinance was the result of efforts of a Boardwalk Task Force, established to address issues previously raised in litigation in this Court. Enacted in the interests of public safety and decreasing congestion on the boardwalk, the regulations require that between and including South First Street and Ninth Street, performers register for one of thirty-three designated areas beginning one week ahead of time. The regulations then impose additional time, manner, and advertising restrictions both to these designated areas and also to the street ends of the rest of the boardwalk between and including Tenth Street and 27th Street.

These regulations govern "performers" as defined by the New Ordinance, including the eleven Plaintiffs in this case. The Plaintiffs range from a puppeteer and a stick balloon

artist who desire to travel up and down the boardwalk performing to small audiences at a time, to two singers and a visual artist who set up their own stages and hope to attract a crowd. They assert that certain regulations in the Ordinance violate their First Amendment rights by imposing an unlawful prior restraint on speech and unlawful time, place, and manner restrictions. Both the Plaintiffs and Ocean City have filed Motions for Summary Judgment. (ECF Nos. 78, 79.) The parties' submissions have been reviewed, and this Court held a hearing on April 17, 2018. At that hearing, the parties essentially agreed that there are no genuine issues of fact to be litigated and that this Court may rule on the issues in this case as a matter of law.

For the reasons stated below, this Court GRANTS IN PART and DENIES IN PART both Motions. The City's Motion for Summary Judgment (ECF No. 78) is PARTIALLY GRANTED and Ocean City may enforce three of the regulations that Plaintiffs challenge in the interests of public safety and decreasing congestion on the boardwalk: Ocean City may enforce the provisions of Chapter 62 which prohibit performing anywhere on the boardwalk after 1:00 a.m., specifically prohibit performing at any time on the street ends of North Division and Dorchester Streets, and further restrict the placing or allowing of an item exceeding six feet above the ground on the boardwalk. These three restrictions on "performers" and "performing" are FACIALLY CONSTITUTIONAL under the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights.

As to all other remaining regulations, the City's Motion for Summary Judgment (ECF No. 78) is DENIED and Plaintiffs' Motion for Summary Judgment (ECF No. 79) is

PARTIALLY GRANTED. Ocean City may not enforce the remaining regulations that Plaintiffs challenge which, as enacted: require all performers wishing to perform between and including First South Street and Ninth Street to register for a designated area beginning one week ahead of time; require performers in the same stretch of the boardwalk to only occupy one of those designated areas and various related restrictions; ban performing before 10:00 a.m. on the entire boardwalk; and prohibit signage or advertising on umbrellas utilized by performers. These restrictions on "performers" and "performing" are FACIALLY UNCONSTITUTIONAL in violation of the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights.[1] The City shall not enforce these provisions as enacted.[2]

---

[1] Specifically, the references to "performer" and "performing" in these Sections of the Code of the Town of Ocean City, Maryland, Chapter 62—Section 62-7, "Performing and vending in the designated spaces," Section 62-8, "Allocation and selection of designated spaces," the portions of Sections 62-10(j)-(k) which prohibit performing before 10:00 a.m., and the portion of Section 62-10(d) which prohibits signage or advertising on an umbrella utilized by a performer—ARE FACIALLY UNCONSTITUTIONAL in violation of the First Amendment of the United States Constitution and Article 40 of the Maryland Declaration of Rights. Therefore, pursuant to the Severability Clause of Chapter 62, Section 62-14, the references to "performer" and "performing" are STRICKEN from the above provisions of Chapter 62. Accordingly, the various derivative references to performers found in Section 62-10 are STRICKEN as well—namely the references to "performer" and "performing" in Sections 62-10(a)-(c), 62-10(f)-(i), and 62-10(o).

[2] While the regulations at issue also apply to vendors and vending, the Plaintiffs are all individuals who do or have performed on the boardwalk and accordingly are entitled to the full protections of the First Amendment. Unlike performers, whether vendors or vending receive the same constitutional protections or can be regulated as commercial speech depends on whether the items being vended constitute protected expression under the First Amendment. *Chase v. Town of Ocean City*, 825 F. Supp. 2d 599, 624 (D. Md. 2011). This involves "distinguishing among artwork with presumptively expressive content," "potentially expressive content," or "no expressive content." *Id.* Neither in the briefings nor at the hearing were such facts discussed. Rather, Plaintiffs arguments focus on the regulations governing performers. *See* ECF No. 79-1 at 32 ("Chapter 62 requires every individual who desires to *perform* on the Boardwalk between May 15 and September 15 to go register with the Clerk's office in person.") (emphasis added). Accordingly, this Court's analysis discusses the constitutionality of the regulations as they apply to performing and performers.

# BACKGROUND

## I.      Challenges to Ocean City's boardwalk regulations

Ocean City, Maryland ("Ocean City" or "the City") is a seaside community located on Maryland's Eastern Shore alongside the Atlantic Ocean.[3] The City's easternmost platted street is a boardwalk that runs from South Second Street to around 27th Street ("the boardwalk"). Three miles long, the boardwalk's width ranges from approximately thirty-two (32) feet to eighty (80) feet. In addition to being a point of access to the beach, the boardwalk is lined with many retail and food shops, hotels, and other attractions. The boardwalk is also known for hosting "street performers," including the Plaintiffs in this case. According to the City Council of Ocean City, the boardwalk attracts approximately 8,000,000 visitors annually. (ECF No. 79-3.)

There is a history in this Court of "boardwalk litigation," involving previous challenges to Ocean City's boardwalk and noise regulations. *Markowitz v. Mayor & City Council of Ocean City, et al.*, No. MJG-95-1676 (D. Md. 1995); *Chase v. Town of Ocean City*, 825 F. Supp. 2d 599 (D. Md. 2011)[4]; *Hassay v. Mayor*, 955 F. Supp. 2d 505 (2013). That history is summarized below.

### A.   1995

On May 4, 1995, Ocean City enacted an ordinance that:

[P]rohibited, from April 15 to October 15, all "peddling," "soliciting," "distributing" and "hawking" on the entire Boardwalk, as well as all streets,

---

[3] While the background information is mostly drawn from information provided by the parties, this Court also takes judicial notice of basic geographic information widely known throughout Maryland. *See Chase v. Town of Ocean City*, 825 F. Supp. 2d 599, 603 n.2 (D. Md. 2011) (citing *United States v Johnson*, 726 F.2d 1018, 1021 (4th Cir. 1984); *Davenport v. City of Alexandria*, 710 F.2d 148, 151 (4th Cir. 1983)).

[4] The Plaintiff in *Chase*, Mark Chase, is one of the Plaintiffs in this case.

beaches and parking lots on the east side (i.e., East of Baltimore Avenue to 33rd Street and East of Coastal Highway from 33rd to 146th Streets) . . . [and] permitted "peddling and soliciting" for noncommercial purposes on the west side but allowed use of a table or stand . . . to promote "religious, political or philo[sophical] beliefs."

*Markowitz v. Mayor & City Council of Ocean City, et al.*, No. MJG-95-1676 at 3 (D. Md. 1995).[5]

Three street performers and a non-profit organization brought suit seeking a declaration from this Court that the ordinance was unconstitutional under the First Amendment to the U.S. Constitution both facially and as-applied and seeking a permanent injunction preventing its enforcement. This Court began its opinion by assuming that the ordinance was content-neutral, and accordingly assessed whether it met intermediate scrutiny as a proper time, place, and manner restriction. Under this analysis, the City had a substantial interest in regulating crowd movement on the boardwalk but failed to show that the ordinance was narrowly tailored. *Id.* at 13. Specifically, Judge Marvin J. Garbis of this Court held that Ocean City had not "explain[ed] how its interest in avoiding pedestrian congestion [wa]s jeopardized by each form of expressive activity banned on the boardwalk." *Id.* at 13-15. Rather, the total ban "at all times and in all places [wa]s vastly overbroad" and did not leave open ample alternative channels of communication. *Id.* at 15-16.

After concluding that the ordinance failed under intermediate scrutiny, Judge Garbis determined that in fact strict scrutiny applied because the ordinance was content-based. *Id.* at 16-17. As this Court explained:

The Ordinance is not content neutral. It more narrowly restricts speech with a commercial motive than speech with a noncommercial motive. The

---

[5] The ordinance read "religious, political, or philological beliefs." As Judge Garbis explained in *Markowitz*, this was an apparent typographical error in view of another regulation's reference to *philosophical* issues. No. MJG-95-1676 at 3 n. 2.

> Ordinance permits solicitors to use a table or stand only if they use the table to "display items promoting the individual's religious, political or philo[sophical] beliefs." A solicitor displaying the same items for a commercial purpose could not use a table.

*Id.* Because the City had not justified only restricting commercially motivated activity, the ordinance failed under both intermediate and strict scrutiny.[6] *Id.* at 17. Accordingly, this Court concluded that "the Ordinance's sweeping restriction of significant forms of expressive activity violates the First Amendment . . . Ocean City's Ordinance bans, or narrowly restricts, substantial amounts of expressive activity which the City has not shown to affect its purported interest in avoiding pedestrian congestion." *Id.* at 19. This Court went on to state that in order for such regulations to pass constitutional muster, the City "must determine those forms of expressive activities, if any, that actually harm or substantially threaten" the City's interests. *Id.* Then, "[f]or each targeted activity, the City must consider when, where, and how the activity harms or threatens the City's interests and develop an ordinance which directly addresses the evil posed by each activity." *Id.* at 20.

### B. 2011

Sixteen years later in September of 2011, Plaintiff Mark Chase filed a complaint for a preliminary injunction to enjoin the enforcement of several post-*Markowitz* boardwalk regulations under the First Amendment.[7] *Chase v. Town of Ocean City*, 825 F. Supp. 2d 599 (D.

---

[6] As explained in more detail below, a content-based restriction must pass strict scrutiny, or be the least restrictive means of achieving a compelling governmental interest. On the other hand, a content-neutral restriction needs to only pass intermediate scrutiny, or materially advance an important or substantial interest and be narrowly tailored to serve that interest. *American Entertainers, LLC v. City of Rocky Mount, NC*, __ F.3d __, 2018 WL 1972885, at *3 (4th Cir. Apr. 27, 2018).

[7] "In order to receive a preliminary injunction, a plaintiff 'must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'" *W.V. Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009) (quoting *Winter v. Natural Res. Defense Council,*

Md. 2011) ("*Chase I*"). Of import in this case are two categories of regulations that Chase challenged: restrictions on the location and manner of peddling, soliciting, hawking, and street performing and a registration requirement for "unlicensed solicitors."[8]

Beginning with the location and manner restrictions, the regulations mandated that no individual could engage in peddling, soliciting, hawking, or street performing "other than within the area encompassed in the extended boundaries of the street ends," with the exception of a complete ban on North Division Street. *Id.* at 606. First, Judge Ellen L. Hollander of this Court analyzed whether the restrictions were content-based or content-neutral in order to determine whether strict scrutiny or intermediate scrutiny applied. Chase argued that the regulations were content-based because they only applied to "certain *kinds* of speech . . . each of which involve[d] speech that seeks to engage in some commercial exchange or receipt from the public." *Id.* at 616 (emphasis added). This Court rejected that argument, explaining that there was no connection between the City's justification for the location restrictions—concerns for public safety and the management of the free flow of pedestrian traffic—and the content of the speech. *Id.* at 619. Rather, witnesses testified about stationary crowds that gathered around street performers regardless of the content of any one performance. *Id.* at 620-21. Second, considering the record before this Court and applying intermediate scrutiny, this Court held that the restrictions were justified by the

<hr>

*Inc.,*555 U.S. 7, 20, 129 S. Ct. 365 (2008)). Accordingly, the *Chase I* opinion discusses the merits of Chase's First Amendment claims.

[8] The third category was restrictions on commercial expression and activity, which this Court found failed intermediate scrutiny. *Chase*, 825 F. Supp. 2d at 622-27. First, Ocean City could not justify the provision by arguing that its purpose was to "prohibit pure commerce on the boardwalk" given that the boardwalk is lined by commercial activity such as shops and attractions. *Id.* at 625. Second, the ordinance did not leave ample alternative avenues for the plaintiff to communicate his protected expression. *Id.*

City's substantial interests in public safety and the free flow of pedestrian traffic, and narrowly tailored to meet those interests:

> By limiting peddling, hawking, soliciting, and street performing to the parts of the boardwalk that are within the "extended boundaries of the street ends," the ordinance ensures that those activities occur at the boardwalk's intersections with other city streets, where congested traffic has sufficient room to maneuver around stationary crowds. Furthermore, the restriction on North Division Street applies only to a single street end, because that particular street end is the only one large enough to accommodate the City's emergency equipment in the event of a fire or medical incident on the beach or boardwalk.

*Id.* at 620. Finally, the location limitations left ample alternative avenues for Chase's expression because he could utilize dozens of locations on the boardwalk.[9] *Id.*

Turning to the registration requirement for "unlicensed solicitors," this Court began by explaining that there is a heavy presumption against laws subjecting the exercise of First Amendment freedoms to the prior restraint of a license. *Id.* at 627 (citations omitted). This Court then noted that the provision was content-neutral and did not "unconstitutionally vest[] unbridled discretion in an administrative official." *Id.* However, despite asserting that the City's interest was to protect children from possible inappropriate conduct by street performers hiding their identities, the provision applied to *all* performers—regardless of whether they wore costumes—as well as religious and political solicitors. *Id.* at 629. Accordingly, the provision was overbroad because it "fail[ed] to strike a balance between the speech affected and the governmental interests [asserted by] Ocean City." *Id.* at 628. Accordingly, this Court issued a Preliminary Injunction prohibiting Ocean City from

---

[9] This Court also found that the manner restrictions, including provisions prohibiting obstructing or blocking pedestrian or vehicular traffic, violating the town's noise ordinances, and using fire or other hazardous materials, were constitutional. *Chase I*, 825 F. Supp. 2d at 621-22.

enforcing various regulations. *Id.* at 631-32. After five months of discovery, the parties filed a proposed Consent Decree, concluding the litigation, which this Court approved on February 6, 2012. *Chase v. Town of Ocean City*, No. ELH-11-1771, 2015 WL 4993583, at *1 (D. Md. Aug. 19, 2015) ("*Chase II*").

## C. 2013

In 2013, a violinist challenged a noise ordinance enacted by Ocean City that prohibited "the audibility of musical instruments and amplified sound at a distance greater than thirty feet." *Hassay v. Mayor*, 955 F. Supp. 2d 505 (2013). The violinist, William Hassay, asserted that the restriction prevented him from communicating any emotion with his music, and therefore he had stopped playing on the boardwalk. *Id.* at 512. During a hearing on the plaintiff's motion for a preliminary injunction, two of the Plaintiffs in this case, Mark Chase and Alex Young, testified that they had also been warned and/or cited for violating the restriction. *Id.* at 513-14. In addition, an expert provided unrebutted testimony that on the boardwalk, a musician needed to play at a level of at least seventy decibels for the music to be intelligible to an audience fifteen feet away. *Id.* at 524. At seventy decibels, however, the music would also be "easily audible" at a distance of thirty feet and accordingly violate the restriction. *Id.*

Applying intermediate scrutiny [10] Judge Hollander held that the plaintiff had established a likelihood of success on the merits with respect to his First Amendment claim. Specifically, the restriction was not narrowly tailored to prevent excessive noise and did not leave open ample alternative channels for communication given that, "[i]n effect, the 30-

---

[10] This Court declined to determine whether in fact the restriction was content-neutral or content-based given that it failed even under intermediate scrutiny. *Hassay*, 955 F. Supp. 2d at 520.

Foot Audibility Restriction [wa]s tantamount to a complete ban on the use of musical instruments and amplified sound on the boardwalk." *Id.* at 524. Accordingly, this Court entered a preliminary injunction against the enforcement of the restriction as applied to the boardwalk. *Id.* at 527. Ultimately, the parties jointly requested that the injunction be made permanent. *Hassay*, Case No. ELH-13-1076 at ECF No. 43.

## II.     Enacting Chapter 62

About three and a half years after *Chase I*, Ocean City established a Boardwalk Task Force (the "Task Force") in an effort to help the Mayor and City Council of Ocean City draft, revise, and enact a new ordinance addressing "the issues that had plagued the Boardwalk." (ECF No. 78-1 at 3.) The Task Force consisted of five individuals: a member of the Ocean City Downtown Association, a Board Member of the Ocean City Development Corporation, an owner of a restaurant and an owner of a shop on the boardwalk, and Mark Chase, one of the Plaintiffs in this case and the previous litigant in *Chase I*. (ECF No. 78-5.) In February and March of 2015, the Task Force held four work sessions, whereby the members studied the issues concerning the boardwalk, heard from members of the public, and ultimately created an eighty-seven page report summarizing witness testimony, applicable case law, and offering recommendations in connection with the boardwalk regulations. *Chase II*, 2015 WL 4993583, at *3. After the Town Attorney reviewed the report, accepting many of the Task Force's recommendations but also the concerns raised by Plaintiff Chase in his dissent to the report, he submitted his own report to the Mayor and City Council. *Id.* at *4. On June 15, 2015, the City Council repealed the regulations at issue in

*Chase I* and replaced them with the current Ocean City regulations (the "New Ordinance" or "Chapter 62"). *Id.*

Prior to the New Ordinance becoming effective on July 27, 2015, Ocean City asked this Court to modify the Preliminary Injunction and Consent Decree entered into as a result of *Chase I* and to allow enforcement of the New Ordinance. *Id.* Fatal to Ocean City's request, however, were that there were not yet any constitutional challenges to Chapter 62. *Id.* at *5 ("[T]o the extent that the Town has enacted a new law, no case or controversy is now pending before the Court as to the legality of such new provisions; no challenge has been lodged to the New Ordinance."). Accordingly, on August 19, 2015, this Court denied Ocean City's motion. *Id.* Two months later, on October 29, 2015, then *pro se* Plaintiffs initiated the instant action challenging the newly enacted Chapter 62.[11]

### III.    Chapter 62 regulations

In implementing the several boardwalk regulations, Chapter 62 discusses the "findings and purposes" that led to the enactment of the new Code of the Town of Ocean City, Maryland, Chapter 62, Boardwalk Performing and Vending. (ECF No. 79-3.) The City Council of Ocean City asserts that performing on the boardwalk must be regulated because, among other reasons, the amount of available space is limited due to the size of the boardwalk and large crowds of visitors.[12] Ocean City's Chapter 62, Boardwalk Performing and Vending, § 62-2(d)(1). The Council asserts that this is particularly true between South First Street and Ninth Street, where there has been "conflicting claims for available spaces,

---

[11] This case was initially assigned to Judge William M. Nickerson and subsequently reassigned on September 28, 2017 to the undersigned Judge Richard D. Bennett upon Judge Nickerson's retirement from this Court.

[12] As discussed *supra* note 1, Chapter 62 also applies to vending. Given that the challenges raised only apply to performing, this opinion omits Chapter 62's references to vending when appropriate.

significant congestion, and consistent overcrowding." *Id.* Accordingly, Chapter 62 states that regulation is necessary "to allocate and manage the use of the limited space on the Boardwalk, to provide law enforcement, Town officials, and members of the public with certainty as to what types of activities are permitted, and to address the present issues of overcrowding, disorder, and unnecessary conflict." § 62-2(d)(4). Further, Chapter 62 asserts that members of the Ocean City Police Department and Ocean City Beach Patrol requested that in addition to North Division Street, performing also be prohibited on the street ends of Dorchester Street to ensure emergency vehicles are able to access the beach quickly and efficiently. § 62-2(d)(6).

Section 62-3 of Chapter 62 then states that "[n]o person shall engage in performing or vending along the Boardwalk, except as specifically allowed in this chapter." Performing is defined as "engag[ing] in a musical instrument, singing, dancing, acting, pantomiming, puppeteering, juggling, engaging in magic, presenting or enacting a play, work of art, physical or mental feat or creating visual art." § 62-1. A performer is defined as a person who performs, with "[i]ndicia of a performer" including "seeking or accepting voluntary contributions through any means, including passing around a hat or leaving open an instrument case or other receptacle, soliciting, or accepting, directly or indirectly, donations after a performance, [and] attempting to draw attention, convene an audience or engage onlookers as spectators or participants in a performance." *Id.*

The Ordinance contains regulations that apply to the street ends of the entire boardwalk as well as regulations that only apply to "the Boardwalk's most congested areas," between and including South First Street and Ninth Street. § 62-10. Generally, the

Ordinance designates thirty-three[13] spaces as the only areas performers may occupy between South First Street and Ninth Street. In order to occupy one of these spaces between May 15 and September 15, performers must engage in a lottery and selection system every week in order to register to use a space for the following week. On the other hand, performers at the street ends between and including Tenth Street and 27th Street "may engage in expressive activities on a first come, first served basis." § 62-9. The Ordinance then contains a time restriction that applies to the entire boardwalk in addition to miscellaneous restrictions, some of which only apply to designated spaces and some of which apply to performing on the entire boardwalk. The regulations are discussed by category in more detail below.

## A.      The registration requirement

Chapter 62 establishes a lottery and selection system (the "system") that applies to the thirty-three designated areas between and including South First Street and Ninth Street from May 15 through September 15 of each year. § 62-7. Under the system, thirty-three (33) spaces have been designated as performance areas by the Town Director and approved by City Council. § 62-8(a); ECF No. 79-11. Performers may obtain one of these designated spaces by participating in the system for two periods of use: Monday through Thursday and Friday through Sunday. § 62-8(a). At the time of the lottery and selection, performers must affirm that the nature and scope of their activities constitute permissible performing. §§ 62-8(c-d). The selection takes place one week in advance of using the desired space, at 9:30 a.m. every Monday at the office of the Town Clerk. § 62-8(b). There are two drawings, the first of which is for 10' by 10' spaces for performers who actually require that amount of space. *Id.*

---

[13] While the map provided to this Court only shows thirty-two spaces, ECF No. 79-11, both parties assert that there are thirty-three designated areas on the boardwalk.

The second drawing is for any remaining 10' by 10' spaces in addition to smaller designated spaces. *Id.* Finally, any remaining open spaces are available on a first-come, first-serve basis until Friday at 3:00 p.m. when the selection period closes. *Id.*

### B.      Time, place, and manner restrictions

### i.      Restriction on location

The thirty-three (33) spaces designated between and including South First Street and Ninth Street range from 5' by 5', 5' by 10', or 10' by 10'. (ECF No. 79-11.) In light of public safety concerns and decreasing congestion on the boardwalk, there are absolutely no designated areas, however, on the street ends located at North Division Street and Dorchester Street. § 62-6. Performers may not select a designated space on the same street end for consecutive election periods during the same week. § 62-10(a). Accordingly, a performer cannot attempt to select the same designated spot for both Monday through Thursday and Friday through Saturday of the same week. *Id.*

### ii.      Time restriction

The Ordinance prohibits performing on the entire boardwalk between 1:00 a.m. and 10:00 a.m. § 62-10(k).[14]

### iii.      Miscellaneous restrictions

There are various provisions that regulate a performer's use of his or her designated space. A performer may not allow anything in his or her space to extend beyond the space's boundary. § 62-10(b). Performers also may not occupy more than one designated space or

---

[14] Two related provisions establish that performers may occupy their designated spaces or street ends between 10:00 a.m. and 1:00 a.m. §§ 62-10(i-j).

solicit another person to obtain or occupy an additional designated space on his or her behalf, § 62-10(f), or purchase, sell, barter, or exchange any designated space in any fashion other than the selection system, § 62-10(h). An additional miscellaneous restriction that does not depend on the establishment of a designated space and applies to the entire boardwalk is that no performer "shall place or allow any item exceeding six feet above the ground." § 62-10(d).

### C.    Advertising restrictions

Finally, there are two provisions of Chapter 62 that govern advertising on the entire boardwalk. First, if an individual utilizes an umbrella for shade from the sun, the umbrella may not include signage or advertising. § 62-10(d). Second, performers may not "advertise, or employ an individual to advertise, his or her performance . . . outside of the designated space or street end area which the performer . . . occupies." § 62-10(o).

### IV.    The Plaintiffs

The Plaintiffs are eleven street performers who perform or have performed on the Ocean City boardwalk. Jim Starck is a puppeteer who, prior to the enforcement of Chapter 62, would walk up and down the boardwalk with marionettes and perform to crowds of five to fifteen people consisting of mostly children for a few minutes at a time. (Starck Aff., ECF No. 79-19.) Bill Campion also performs for mostly children by creating animals, items, and characters out of stick balloons. (Campion Aff., ECF No. 79-14.) He has testified that his performances only take a few minutes and prior to Chapter 62, he would change his location throughout the day. (*Id.*) Joseph Smith is a magician and ventriloquist who performs to slightly larger crowds, but would also change locations during the day and into the night.

(Smith Aff., ECF No. 79-18.) Anthony Button is a mime who performs in a "gold costume" and varies between maintaining "statue like stillness" and interacting with pedestrians. (Button Aff., ECF No. 79-13.) He testified that his audiences vary in size and that being confined to a designated space "fundamentally alters and undermines the character of [his] performance." (*Id.*)

Mike Moeller sketches portraits of visitors while sitting in a folded chair with a small easel and motorized cart that carries his supplies and displays examples of his previous work. (Moeller Aff., ECF No. 79-17.) He testified that he often attracts an audience, and prior to Chapter 62, he might have changed locations on the boardwalk due to changing pedestrian traffic, weather, other performers, and other conditions. (*Id.*) Mark Chase is a visual artist who creates paintings in front of his audience. (Chase Aff., ECF No. 79-15.) He testified that his performances take fifteen minutes or less, typically draw a crowd of a couple dozen individuals, and cannot be done in a 5' by 5' or 5' by 10' space. (*Id.*)

Don Bloom is a musician who performs with a microphone, amplifier, music stand and guitar case. (Bloom Aff., ECF No. 79-12.) He testified that he requires more space because he draws a crowd, yet because performing in the 5' by 5' and 5' by 10' spots is "doable," he has to enter the second lottery each week. (*Id.*) For various reasons including competing performers and events Ocean City sponsors throughout the summer, he testified that being limited to one space for several days hinders his performances. (*Id.*) Alex Young is also a musician who performs with a small stationary set up and testified that prior to Chapter 62, he would perform until 4:00 or 5:00 a.m. (Young Aff., ECF No. 79-20.)

Finally, Plaintiff Anthony Christ has not been a regular performer on the boardwalk. (Christ Aff., ECF No. 79-16.) However, on September 5, 2015, he went to the boardwalk and sang the National Anthem in a designated space that was not registered to him. (*Id.*) After an officer advised Chase that he would be cited if he sang another song, Chase sang another song and received a citation for violating Chapter 62. (*Id.*) The final two Plaintiffs, Alexandra Dawson and Ion Ionescu, are asserted in the Fourth Amended Complaint to be a gymnast and violinist respectively. (ECF No. 73.)

## V.     Motion to Dismiss

Plaintiffs filed the Original Complaint in this case *pro se* on October 29, 2015. (ECF No. 1.) At first, the Plaintiffs had difficulty naming the proper defendants or effecting proper service of process. Subsequently, on March 21, 2016, Judge William M. Nickerson of this Court issued a Memorandum and Order quashing service of process, directing the Clerk of this Court to reissue summons, and directing the Plaintiffs to attempt to effect proper service. (ECF Nos. 30, 31.) On September 9, 2016, after retaining counsel, Plaintiffs filed a Third Amended Complaint naming only the Town of Ocean City, Maryland as a Defendant and limiting Plaintiffs' claims to the First Amendment and Article 40 of the Maryland Declaration of Rights. (ECF No. 51.)

On October 12, 2016, Ocean City filed a Motion to Dismiss Plaintiffs' Complaint for failure to state a claim. *Christ v. Mayor of Ocean City*, No. WMN-15-3305, 2017 WL 1382315 (D. Md. Apr. 18, 2017).[15] In ruling on the Motion to Dismiss, Judge Nickerson noted that all of the Plaintiffs engage in works and performances that are protected speech under the First

---

[15] This case was subsequently reassigned on September 28, 2017 to the undersigned Judge Richard D. Bennett upon Judge Nickerson's retirement from this Court.

Amendment, and the boardwalk is a traditional public forum. *Id.* at *2. This Court applied

the intermediate scrutiny standard and found that Plaintiffs had stated their claims:

> Plaintiffs provide numerous examples in the Third Amended Complaint of
> just how the new ordinances have restricted the performance of their various
> artistic endeavors. They have further alleged that these restrictions are
> "substantially broader than necessary to achieve [Ocean City's] interest" and
> fail to "leave open ample alternative channels for communication of the
> information that speakers may wish to communicate."

*Id.* at *3. After this Court denied the Motion to Dismiss, Plaintiffs filed the operative Fourth

Amended Complaint. (ECF No. 73.) Discovery ensued, and on October 2, 2017, both

Ocean City and the Plaintiffs filed Motions for Summary Judgment. (ECF Nos. 78, 79.) On

April 17, 2018, this Court held a hearing solely on legal argument, with nine of the eleven

Plaintiffs present. (ECF No. 87.)

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant

summary judgment if [a] movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A

material fact is one that "might affect the outcome of the suit under the governing law."

*Libertarian Party of Va. v. Judd*, 718 F.3d 308, 313 (4th Cir. 2013) (quoting *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A genuine issue over a material fact exists "if the

evidence is such that a reasonable jury could return a verdict for the non-moving party."

*Anderson*, 477 U.S. at 248. To make this showing, the non-moving party must "do more than

simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In ruling on a motion for summary judgment, a court must consider the facts and all reasonable inferences in the light most favorable to the non-moving party. *Judd*, 718 F.3d at 312; *see also Scott v. Harris*, 550 U.S. 372, 378 (2007). When both parties file motions for summary judgment, as here, this Court applies the same standard of review to both motions, considering "'each motion separately on its own merits to determine whether either of the parties deserves judgment as a matter of law.'" *Defenders of Wildlife v. North Carolina Dept. of Transp.*, 762 F.3d 374, 392 (4th Cir. 2014) (quoting *Bacon v. City of Richmond, Va.*, 475 F.3d 633, 638 (4th Cir. 2007)).

## ANALYSIS

At the hearing of April 17, 2018, the parties essentially agreed that there are no factual disputes to be addressed and that this Court should rule on the issues as a matter of law. Plaintiffs challenge Chapter 62 under the First Amendment to the United States Constitution and its Maryland counterpart, Article 40 of Maryland's Declaration of Rights. The First Amendment states in pertinent part that "Congress shall make no law . . . abridging the freedom of speech." Article 40 "is read generally *in pari materia* with the First Amendment" and Plaintiffs do not assert that the protection of Article 40 exceeds that of the First Amendment. *Nefedro v. Montgomery County*, 414 Md. 585, 593 n. 5, 996 A.2d 850 (Md. 2010); *Tepeyac v. Montgomery County*, 5 F. Supp. 3d 745, 754 n. 4 (D. Md. 2014). Accordingly, this Court considers the Plaintiffs' claims in the context of the First Amendment.

The Fourth Amended Complaint raises both facial and as-applied challenges to the various provisions of Chapter 62. (ECF No. 73 at ¶¶ 129-30, 138-39.) As the United States Court of Appeals for the Fourth Circuit explained in *Educational Media Co. at Virginia Tech,*

*Inc. v. Insley*, 731 F.3d 291 (4th Cir. 2013), "[t]he difference between a facial challenge and an as-applied challenge lies in the scope of the constitutional inquiry." 731 F.3d at 298 n. 5. Under the First Amendment, a plaintiff may successfully challenge the facial constitutionality of a statute by showing that the law is "overbroad" because "'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep.'" *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577 (2010) (quoting *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n. 6, 128 S. Ct. 1184 (2008)). Accordingly, under a facial challenge a court may consider hypothetical applications of the law to nonparties. *Preston v. Leake*, 660 F.3d 726, 738 (4th Cir. 2011). On the other hand, "an as-applied challenge is 'based on a developed factual record and the application of a statute to a specific person.'" *Insley*, 731 F.3d at 298 n.5 (quoting *Richmond Med. Ctr. for Women v. Herring*, 570 F.3d 165, 172 (4th Cir. 2009)). Aside from providing affidavits for nine of the eleven Plaintiffs, neither party addressed in their briefs nor at the hearing any individual Plaintiff's as-applied challenges to Chapter 62. Further, the majority of the case law relied on and distinguished by both parties concerns whether the regulations are overbroad, and accordingly *facially* unconstitutional. Therefore, this Court addresses the facial constitutionality of the Chapter 62 regulations.

It is established that all of the Plaintiffs' activities—including singing, puppeteering, miming, and drawing—are protected speech under the First Amendment and covered by Chapter 62's definition of "street performer." *See Chase v. Town of Ocean City*, 825 F. Supp. 2d 599, 614 (D. Md. 2011). Judge Nickerson has specifically previously so held in this case. *Christ v. Mayor of Ocean City*, No. WMN-15-3305, 2017 WL 1382315 (D. Md. Apr. 18, 2017).

Further, it is established that the boardwalk is a traditional public forum. *See Chase*, 825 F. Supp. 2d at 614-15 (summarizing cases and concluding that the boardwalk constitutes a traditional public forum). In a traditional public forum, the government's power to regulate speech "is 'limited, though not foreclosed.'" *Reynolds v. Middleton*, 779 F.3d 222, 229 (4th Cir. 2015) (quoting *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 555 (4th Cir. 2013)). If the government regulates speech based on its content, the restriction must pass strict scrutiny, or "be narrowly tailored to serve a compelling government interest." *Christian Legal Society v. Martinez*, __ U.S. __, 130 S. Ct. 2971, 2984 n. 11 (2010). In contrast, content-neutral "time, place, and manner" restrictions need only pass intermediate scrutiny. As the Fourth Circuit recently discussed in *American Entertainers, LLC v. City of Rocky Mount, North Carolina*, __ F.3d __, 2018 WL 1972885 (4th Cir. Apr. 27, 2018), the court will uphold a regulation under intermediate scrutiny "if 'it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest.'" 2018 WL 1972885, at *3 (quoting *Satellite Broad & Commc'ns Ass'n v. F.C.C.*, 275 F.3d 337, 355 (4th Cir. 2001)). This Court begins by analyzing whether Chapter 62 is content-based or content-neutral.

## I.     Chapter 62 is content-neutral[16]

As the Supreme Court recently explained in *Reed v. Town of Gilbert, Arizona*, __U.S. __, 135 S. Ct. 2218 (2015), "[g]overnment regulation of speech is content-based if a law applies

---

[16] This analysis does not apply to the challenged advertising restrictions. *See infra* Part II.C. A restriction on advertising is a restriction on commercial speech which receives intermediate scrutiny. *Educational Media Co. at Virginia Tech, Inc. v. Insley*, 731 F.3d 291, 297 (4th Cir. 2013) ("Under *Central Hudson* [*Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 100 S. Ct. 2343 (1980)], a restriction on commercial speech must withstand 'intermediate scrutiny' in order to survive a First Amendment challenge.")

to particular speech because of the topic discussed or the idea or message expressed." 135 S. Ct. at 2227 (citations omitted). There are two categories of content-based regulations. First, there are regulations that on their face "draw[] distinctions based on the message a speaker conveys." *Id.* (citation omitted). A regulation does this either by regulating speech by particular subject matter or by its function or purpose. *Id.* Second, facially neutral regulations may still be content-based if they "cannot be 'justified without reference to the content of the regulated speech,'" or they "were adopted by the government 'because of disagreement with the message [the speech] conveys.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S. Ct. 2746 (1989)). On the other hand, if a "'regulation was adopted for a purpose *unrelated* to the suppression of expression—e.g., to regulate conduct, or the time, place, and manner in which expression may take place,'" the regulation is content-neutral. *American Entertainers,* 2018 WL 1972885, at *3 (quoting *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 512-23 (4th Cir. 2002)) (emphasis added).

Plaintiffs argue that Chapter 62 is content-based because "[i]t regulates the expressive conduct of only those who 'engage in performing or vending.'" (ECF No. 79-1 at 19 (quoting § 62-3).) Accordingly, Plaintiffs assert that "Chapter 62 is a regulatory scheme for a certain *kind* of speech: performing" and therefore it is content-based. (ECF No. 84 at 3 (emphasis added).) Plaintiffs also reference "Admissions" from Ocean City that the New Ordinance does not address religious or political speech.[17] In response, Ocean City asserts

---

[17] Some of the specific admissions (ECF No. 79-6) are:
1. Chapter 62 does not address religious/political speech.
2. Performer is a defined term within Chapter 62 and is not applicable to persons engaging in religious/political speech.
3. Persons wishing to engage in religious/political speech are not required to use designated spaces.

that Chapter 62 is content-neutral because it does not require "an enforcement authority to examine the content of the message conveyed by the street performer to determine" if Chapter 62 has been violated. (ECF No. 78-1.)

Following this Court's content-based versus content-neutral analyses in *Markowitz* and *Chase I*, Chapter 62 is content-neutral. As described above, the 1995 ordinance in *Markowitz* was content-based because it "more narrowly restrict[ed] speech with a commercial motive than speech with a noncommercial motive.'" No. MJG-95-1676 at 16-17. It also "permit[ted] solicitors to use a table or stand *only if* they use[d] the table to 'display items promoting the individual's *religious, political or philo[sophical]* beliefs.'" *Id.* (emphasis added). The ordinance, then, clearly regulated speech on the basis of its content and the message the speaker was conveying.

In contrast, the current Chapter 62 is similar to that at issue in *Chase I* and does not draw distinctions based on the message a performer conveys. In fact, the Plaintiffs make the same argument that this Court previously rejected; they argue that the regulations are content-based because they only apply "to certain *kinds* of speech." 825 F. Supp. 2d at 616 (emphasis added). However, as in *Chase I*, there is no connection between the City's justification for enacting Chapter 62, concerns for public safety and the management of the free flow of pedestrian traffic, and the *content* of the Plaintiffs' performances. *Id.* at 619. Plaintiffs attempt to distinguish Chapter 62 from the ordinance at issue in *Chase I* by noting that Chapter 62 only applies to two types of activities: performing and vending. The amount of restricted activities, however, does not alter the fact that Ocean City is not restricting an activity based on the message it conveys.

Chapter 62 defines performing as "engag[ing] in a musical instrument, singing, dancing, acting, pantomiming, puppeteering, juggling, engaging in magic, presenting or enacting a play, work of art, physical or mental feat or creating visual art." § 62-1. While Ocean City has not banned *all* potential types of performances, there is no "connection between Ocean City's justification for its restriction of locations on the boardwalk," public safety and the free flow of pedestrian traffic, and "the content of the speech." *Chase I*, 825 F. Supp. 2d at 619; *see also Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48, 106 S. Ct. 925, 929-930 (1986) ("A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others."); *American Entertainers*, 2018 WL 1972885, at *3 (applying intermediate scrutiny because the defendant's purpose for adopting the ordinance at issue—"regulat[ing] the deleterious secondary effects of adult entertainment"—was unrelated to the suppression of expression); *Peck v. City of Las Vegas*, No. 2:15-cv-02070, 2016 WL 4697339, at *6 (D. Nev. Sept. 6, 2016) (explaining that the provisions regulating street performances were content-neutral because they "d[id] not distinguish based on the content of the message conveyed by the performers . . . [or] prohibit or restrict street performers from communicating a particular set of messages"). Therefore, the regulations in Chapter 62 are content-neutral.

## II.      Chapter 62 regulations

Having determined that Chapter 62 is content-neutral, this Court applies intermediate scrutiny. To pass intermediate scrutiny, the regulations must be "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information" that the speaker wishes to communicate. *Clark v.*

*Community for Creative Non-Violence*, 468 U.S. 288, 293, 104 S. Ct. 3065 (1984). The parties do not dispute that Plaintiffs have met their "'initial burden of proving that speech was restricted by the governmental action in question.'" *Reynolds v. Middleton*, 779 F.3d 222, 226 (4th Cir. 2015) (quoting *Lim v. City of Long Beach*, 217 F.3d 1050 (9th Cir. 2000)). The burden then is on Ocean City to prove the constitutionality of Chapter 62. *Id.* (citing *McCullen v. Coakley*, __ U.S. __, 134 S. Ct. 2518 (2014)). In *Reynolds*, the Fourth Circuit articulated what "the [City] must present in order to carry its burden of proof" under intermediate scrutiny, explaining: (1) the existence of a governmental interest may be established by "common sense and the holdings of prior cases"; (2) "objective evidence is not always required to show that a speech restriction furthers the government's interests"; and (3) the government is required "to present actual evidence supporting its assertion that a speech restriction does not burden substantially more speech than necessary; argument unsupported by the evidence will not suffice to carry the government's burden." 779 F.3d at 228-29 (citing *McCullen*, 134 S. Ct. at 2535).

This Court begins by noting that Ocean City has established substantial government interests for enacting Chapter 62. As Plaintiffs acknowledged during the hearing, the City has a substantial interest in public safety and the free flow of pedestrian traffic. *See Chase*, 825 F. Supp. 2d at 620 (explaining that the ordinance was "justified by Ocean City's substantial interests in public safety and the free flow of pedestrian traffic"); *see also McCullen*, 134 S. Ct. at 2535 (recognizing "the legitimacy of the government's interests in 'ensuring public safety and order, [and] promoting the free flow of traffic on streets and sidewalks'" (quoting *Schenck v. Pro-Choice Network of Western N.Y.*, 519 U.S. 357, 376 117 S. Ct. 855 (1997))). The

City also has a significant interest in managing competing uses when large groups intend to use public property. *See Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1034 (9th Cir. 2009) ("The Supreme Court has recognized a government's significant interest in managing competing uses when large groups of people intend to use public property." (citing *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 322, 122 S. Ct. 775 (2002))).

The issue in this case is whether the categories of regulations materially advance and are narrowly tailored to serve those interests, and whether they leave ample alternative channels of communication. In determining whether Chapter 62 "'materially advances [Ocean City's interests] by redressing past harms or preventing future ones,'" the Fourth Circuit has instructed that lower courts may consider the facts presented "along with a healthy dose of common sense" and logic. *Reynolds*, 779 F.3d at 229 (quoting *Ross v. Early*, 746 F.3d 546, 556 (4th Cir. 2014), *cert. denied*, __ U.S. __, 135 S. Ct. 183 (2014)). "In addition to furthering a significant governmental interest, a narrowly tailored regulation 'must not burden substantially more speech than is necessary to further the government's legitimate interests.'" *Id.* at 230 (quoting *McCullen*, 134 S. Ct. at 2535). While the regulation does not need to be the least restrictive means available, "'the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" *Id.* (quoting *McCullen*, 134 S. Ct. at 2535). Courts must consider "the amount of speech covered by the ordinance and whether there is an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve." *Watchtower Bible & Tract. Soc. of N.Y., Inc. v. Village of Stratton*, 536 U.S. 150, 165, 122 S. Ct. 2080 (2002). Further, "a court 'must . . . take account of the place to

which the regulations apply,' including the 'nature' of the forum and 'the pattern of its normal activities.'" *Hassay v. Mayor*, 955 F. Supp. 2d 505, 521 (D. Md. 2013) (quoting *Madsen v. Women's Health Ctr., Inc.*, 521 U.S. 753, 772, 114 S. Ct. 2516 (1994)). Finally, Chapter 62 must leave open adequate alternative channels of communication, though they "'need not be the speaker's first or best choice or provide the same audience or impact for the speech.'" *Reynolds*, 779 F.3d at 232 (quoting *Ross*, 746 F.3d at 559).

This Court addresses the constitutionality of each category of challenged regulations below.

## A.    The registration requirement

As described above, performers wishing to perform on the boardwalk between and including South First Street and Ninth Street may only do so in one of the thirty-three designated spaces. In order to occupy one of these spaces, performers must engage in a lottery and selection system and, if chosen, register for their space.[18] The lottery occurs on Monday mornings one week in advance of the period of use. If selected, performers must affirm that the nature and scope of their activities constitute permissible performing. If any spaces are not claimed during the initial selection, they remain available for registration on a first-come, first-serve basis until Friday at 3:00 p.m. when the registration period closes.

As this Court previously noted in *Chase I*, "[t]he Supreme Court has long been wary of laws 'subjecting the exercise of First Amendment freedoms to the prior restraint of a license,' *Forsyth County v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (citations omitted), and there is a 'heavy presumption' against their validity." 825 F. Supp. 2d at 627 (citation

---

[18] As noted previously, the lottery and selection system is only in place during the summer months, between May 15 and September 15.

omitted). However, such a law may be constitutional if it (1) is content-neutral; (2) does not apply to an overbroad amount of speech; (3) strikes "'an appropriate balance between the affected speech and the governmental interests that the ordinance purports to serve'"; (4) establishes clear criteria for obtaining a license; and (5) is ordinarily subjected to procedural safeguards so that an individual denied a license may be able to obtain a judicial determination of whether a license may validly be withheld.[19] *Id.* (citations omitted).

Plaintiffs argue that they are entitled to summary judgment because the Ordinance is a prior restraint and Ocean City has not "struck a balance between the affected speech and the interests the Town purports to serve." (ECF No. 79-1 at 37.) Plaintiffs argue that the specific registration requirements—registering in person one week ahead of time, disclosing the individual's name and performance, and requiring registration even for spaces not initially assigned during the lottery—are unconstitutional restrictions hindering anonymity and creating procedural and temporal hurdles to engaging in speech. Ocean City argues that the system was enacted to prevent congestion and overcrowding on the boardwalk and to protect the safety of the public, and does so without burdening more speech than necessary. (ECF No. 83 at 10.) Further, Ocean City asserts that in light of a situation where a street performer was accused of child molestation, the public expressed concern regarding a lack of knowledge as to the identity of the street performers. (*Id.* at 9.)

---

[19] At the hearing, counsel for Ocean City asserted that the lottery and selection system is more akin to a "sign up" than a "permitting" requirement. However characterized, the system requires individuals to receive authorization from the City before engaging in certain expression in one of the thirty-three designated areas, and accordingly, imposes a prior restraint on speech. *See Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130, 112 S. Ct. 2395 (1992) (explaining that an ordinance requiring a permit before authorizing public speaking is a prior restraint on speech).

As this Court explained in *Hassay*, "Ocean City 'may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'" 955 F. Supp. 2d at 521 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799, 109 S. Ct. 2746 (1989)). In *Chase I*, the registration requirement for unlicensed solicitors failed because it required all performers and religious and political solicitors to register even though the City's interest was to protect children from potential inappropriate conduct by *costumed performers*. 825 F. Supp. 2d at 629. Accordingly, the registration requirement was "vastly overinclusive with respect to the City's stated concerns about the anonymity of costumed performers." *Id.* With respect to the specific interests asserted here—public safety and decreasing congestion—the United States Courts of Appeals for both the Fourth and Ninth Circuits have struck down overly broad speech regulations on the ground that they did not take into account whether *all* the regulated individuals actually created traffic or congestion problems.

In *Cox v. City of Charleston, SC*, 416 F.3d 281 (4th Cir. 2005), the Fourth Circuit considered a local parade ordinance that prohibited organizing, holding, or participating in a parade, meeting, exhibition, assembly or procession on the streets or sidewalks of the city unless authorized by a written permit. Specifically, the Fourth Circuit was tasked with determining whether the ordinance, without an exception for small gatherings, was facially constitutional. *Id.* at 284-87. The court began by noting that the ordinance applied to political speech and created both a "procedural hurdle for filling out and submitting a written application" and a "temporal hurdle of waiting for the permit to be granted." *Id.* at 285. The court then explained that the city's justification for requiring registration—safety—

did not apply to groups of two or three individuals. *Id.* As to these smaller groups, the ordinance criminalized expression that did "nothing to disturb the peace, block the sidewalk, or interfere with traffic." *Id.* at 286. Accordingly, "[b]ecause the City ha[d] not established why burdening such expression [wa]s necessary to facilitate its interest in keeping its streets and sidewalks safe, orderly, and accessible," the ordinance burdened substantially more speech than necessary to further the asserted interests and was facially unconstitutional. *Id.* Subsequently, in *Green v. City of Raleigh*, 523 F.3d 293 (4th Cir. 2008), the Fourth Circuit upheld a notice requirement for picketers that allowed anonymous picketing and contained a small group exception for groups of fewer than ten individuals.

The Ninth Circuit specifically addressed an ordinance concerning street performers in the context of crowd size in *Berger v. City of Seattle*, 569 F.3d 1029 (9th Cir. 2009) (en banc). The ordinance at issue required street performers at the Seattle Center to obtain permits and established a first-come first-serve rule for using designated locations.[20] *Id.* at 1034. The city asserted that the permitting requirement promoted its interest in increasing safety by reducing territorial disputes and hostile performer behavior and alleviating coordination and traffic flow concerns. *Id.* at 1041-46. Upon review of the constitutionality of the requirement, the court first generally discussed "single-speaker" registration requirements and noted that the requirement was "not limited to only those performers who seek to attract (or who do, in fact, attract) a crowd of a sufficiently large size." *Id.* at 1041. The court then explained that the permitting requirement was not narrowly tailored because it was overbroad, did not meaningfully promote the city's asserted interests, and addressed interests that could have

---

[20] Notably, distinct from the facts of this case, the permit system did not place a limit on the number of permits that could be issued or assign a particular performer to a designated space. *Id.* at 1037.

been achieved by less intrusive means. *Id.* In its discussion, the court found "particularly compelling" the fact that:

> [The permitting requirement] applies to a large number of individuals who have *no connection* to the City's asserted reasons for the permitting requirement . . .. Similarly, the permitting requirement applies to street performers who pose no realistic coordination or traffic flow concerns, as well as those who might. It is hard to fathom how an individual performing for two or three others in a park as large as the Center would pose coordination or traffic flow problems for the City. . . The City has not provided any evidence that street performers usually, or even sometimes, gather crowds of the size that might justify coordination-of-use permits . . ..

*Id.* at 1045-46 (emphasis added).

The court further opined whether the requirement would be constitutional if it applied "only to those performances that are 'aimed at attracting an audience.'" *Id.* at 1046. The court explained that it would still not be constitutional because *most* performers seek to attract a crowd regardless of whether they actually attract one, and leaving to an enforcement authority the determination of whether a performer sought to attract a crowd would lend itself to discriminatory enforcement.[21] *Id.* at 1047-48. Subsequently, in *Dowd v. City of Los Angeles*, No. CV09-06731, 2013 WL 4039043 (C.D. Cal. Aug. 7, 2013), the United States District Court for the Central District of California distinguished a Venice boardwalk ordinance from that in *Berger* on the ground that unlike in *Berger*, it did not require a permit for *all* performers. Rather, a permit was only required for performers wishing to set up

---

[21] The Ninth Circuit also opined that perhaps "the City could draft a rule for the Seattle Center that requires performances that attract an audience of a given size to obtain a permit, and enforce that rule for performances that actually attract that size audience." *Berger*, 569 F.3d at 1047 (citing *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022 (9th Cir. 2006).

equipment, and regardless, anyone could perform in an unoccupied space after noon each day if the registered performer was not present. [22] *Id.* at *9.

As in *City of Charleston* and *Berger*, the registration requirement in this case is overbroad and is not narrowly tailored to advance Ocean City's interests. Although the City's interests are public safety and preventing congestion on the boardwalk, the lottery system applies to *all* street performers regardless of whether an individual performer actually draws a crowd. For example, street performers such as Plaintiffs Jim Starck and Bill Campion, puppeteers and stick balloon artists, are required to participate in this process although their performances are catered to small audiences and only last a few minutes. Even though the nature of their performances do nothing to "disturb the peace, block the sidewalk, or interfere with traffic," Chapter 62 requires them to register a week before engaging in their protected speech. *City of Charleston*, 416 F.3d at 286. While the registration requirement need not be the least restrictive means available, "'the government still may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals.'"[23] *Reynolds*, 779 F.3d at 230 (quoting *McCullen v. Coakley*, ___ U.S.

---

[22] Another case the parties cite is *Peck v. City of Las Vegas*, No. 2:15-cv-02070-JAD-PAL, 2016 WL 4697339 (D. Nev. Sept. 6, 2016), in which the United States District Court for the District of Nevada considered a registration and lottery system for obtaining spots in a pedestrian mall. Ultimately, the court upheld the registration requirement as applied to street performers wishing to obtain a spot through the lottery process when registration could be done (1) online or in person, (2) within 72 hours *after* using a performance zone, and (3) anonymously. However, the court held that the plaintiff had a likelihood of showing that a regulation requiring *all* individuals to register, even if they did not wish to perform in spots that required participating in the lottery system, burdened more speech than necessary.

[23] During the hearing, counsel for Ocean City cited dicta from *Chase I* whereby this Court opined that even if the City had relied on the interests of preventing congestion and ensuring the free flow of pedestrian traffic for the "unlicensed solicitors" registration requirement, the registration provision still would not have been narrowly tailored in part because, "[f]or instance, Ocean City's registration requirement does not designate a particular boardwalk location for each registered performer or solicitor, nor does it limit the total number of performers and solicitors who may be registered or who may operate on the boardwalk at any given time." 825 F. Supp. 2d at 630. Certainly, Chapter 62 both limits a performer to a particular area and only allows

__, 134 S. Ct. 2518, 2535 (2014)); *see also Boardley v. U.S. Dept. of Interior*, 615 F.3d 508 (D.C. Cir. 2010) (holding that a licensing scheme requiring advanced permits to engage in expressive activity in national parks was unconstitutional, explaining in part that the government failed to show that most individuals and small groups engaging in free speech would pose significant crowding issues or strain park resources).

Further, the City has not offered any reason why beginning the sign up process *one week* ahead of time or closing registration at 3 p.m. the Friday before the operative week further the interests of public safety and the free flow of pedestrian traffic. Under the current system, a performer who has registered with the City before—but failed to register the specific week prior—cannot spontaneously walk up to the boardwalk and claim an unoccupied spot. The limitation is even more restrictive for those visiting Ocean City for limited periods of time who wish to express themselves on the boardwalk. *Compare City of Charleston*, 416 F.3d 281 at 285 ("'Both the procedural hurdle of filling out and submitting a written application, and the temporal hurdle of waiting for the permit to be granted may discourage potential speakers.'" (quoting *Grossman v. City of Portland*, 33 F.3d 1200, 1206 (9th Cir. 1994))); *with Peck v. City of Las Vegas*, No. 2:15-cv-02070, 2016 WL 4697339, at *11 (D. Nev. Sept. 6, 2016) ("It also does not squash a person's ability to engage in a spontaneous performance because registration can be accomplished up to 72 hours *after* a performer has used one of the designated performance zones.") (emphasis added).

---

thirty-three designated area between and including South First Street and Ninth Street. However, the requirement is still not narrowly tailored to serve the City's interests given that it substantially burdens the speech of performers who *do not threaten* public safety or the free flow of traffic.

One issue counsel for Ocean City raised during the hearing on April 17, 2018 was the administrative burden placed on the City to determine when a performer may potentially attract a crowd sufficiently large to implicate its interests. Notably, the Fourth Circuit ended its opinion in *City of Charleston* addressing that concern:

> [W]e decline [the plaintiff's] invitation to announce a numerical floor below which a permit requirement cannot apply. The relevant legislative body (the city council here) is the proper forum for balancing the multitude of factors to be considered in determining how to keep the streets and sidewalks of a city safe, orderly, and accessible in a manner consistent with the First Amendment. We emphasize, however, that cities have a number of tools at their disposal to meet that goal. Rather than enforcing a prior restraint on protected expression, cities can enforce ordinances prohibiting and punishing conduct that disturbs the peace, blocks the sidewalks, or impedes the flow of traffic. . . Cities can also pass ordinances that "regulate only the volume, location, or duration of [protected] expression," rather than subjecting all speech to a permit requirement. . . And, if the legislative body determines that a permit requirement is absolutely necessary to effectuate the relevant goals, it should tailor that requirement to ensure that it does not burden small gatherings posing no threat to the safety, order, and accessibility of streets and sidewalks.

416 F.3d at 286 (citations omitted).[24] By failing to differentiate among performers, "a substantial portion of the burden on speech does not serve to advance [Ocean City's] goals." *McCullen v. Coakley*, __ U.S. __, 134 S. Ct. 2518, 2535 (2014). Accordingly, Chapter 62's registration requirement is not narrowly tailored and is facially unconstitutional.[25]

## B.     Time, place, and manner restrictions

### i.     Restriction on location

Having held that the registration requirement is unconstitutional, this Court next

---

[24] Subsequently, in *Green v. City of Raleigh*, 523 F.3d 293 (4th Cir. 2008) the Fourth Circuit held that the City of Raleigh provided a "well-considered justification" for eliminating a notice requirement for picketing on sidewalks and other public ways for groups of fewer than ten people.

[25] Because the registration requirement does not meet the narrowly tailored prong, this Court does not address whether it leaves open ample alternative methods of communication.

considers whether Ocean City may still limit street performing to the designated areas. As described above, there are thirty-three designated spaces—ranging from 5' by 5', 5' by 10', or 10' by 10'—located between and including South First Street and Ninth Street with the exceptions of North Division and Dorchester Streets. Chapter 62 also requires street performers to occupy the same space from Monday through Thursday and Friday through Sunday, but does not allow one performer to occupy the same space during both time periods in a given week. The Plaintiffs again assert that these location restrictions are overbroad because by applying to all performers, they substantially burden more speech than necessary to advance the City's interests. Further, Plaintiffs assert that the areas unnecessarily restrict some street performers to a maximum 10' by 10' area.

Beginning with the absolute bar of performing on the street ends of North Division and Dorchester Streets, this time, place, and manner restriction is narrowly tailored to meet the City's substantial interests in public safety and the free flow of traffic. In *Chase I*, this Court held that the ban on North Division Street was constitutional "because that particular street end [wa]s the only one large enough to accommodate the City's emergency equipment in the event of a fire or medical incident on the beach or boardwalk." 825 F. Supp. 2d at 620. Chapter 62 states that since *Chase I*, "members of the Ocean City Police Department and Ocean City Beach Patrol have indicated that they need to be able to access the beach via Dorchester Street in addition to North Division Street." § 62-2(d)(6). In support, Lieutenant Ward Kovacs, a thirty-three-year veteran of the Ocean City Beach Patrol, testified during the task force hearings that the majority of the patrol's vehicles are kept at their headquarters building on Dorchester Street. (ECF No. 78-3 at 11.) Further, the Lieutenants and Captains

operate out of headquarters and that is where testing for upcoming lifeguard seasons occurs. (*Id.*)

With regard to interactions with street performers, Lieutenant Kovacs testified that there are between twenty to forty boardwalk crossings daily at Dorchester Street with either trucks or ATVs, and for the last third of their 10:00 a.m. to 6:00 p.m. shift, almost every crossing involves performers. (*Id.*) While most interactions are "just inconveniences . . . some are life-threatening delays." (*Id.*) He further explained how getting from headquarters to North Division Street requires traveling on Baltimore Avenue which is unsafe for the ATVs and often congested. (*Id.* at 12.) In response to a question regarding whether all performers—or only performers that draw a crowd—cause issues for the patrol, Lieutenant Kovacs testified that "it's an impedance to our travel regardless of whether they have a large crowd or not." (*Id.* at 14.) Finally, during the discussion regarding Dorchester Street, Plaintiff Chase stated that he "ha[d] no problem" with a ban on Dorchester Street. (*Id.*) A ban on the particular street ends at North Division and Dorchester Streets promotes the City's interests in public safety and leaves ample alternative avenues for the Plaintiffs' expressions.

This Court now turns to whether constraining all performers to the designated areas is narrowly tailored to meet the City's interests, and is guided by similar factors that invalidated the permitting requirement. As this Court instructed in *Markowitz*, in enacting its regulations the City needed to determine whether street performing actually harms or threatens the City's interests, and if so, "consider when, where, and how the activity harms or threatens the City's interests and develop an ordinance which *directly addresses* the evil posed by [the] activity." No. MJG-95-1676 at 20. Like the registration requirement,

constraining *all* performers to the designated areas is an overbroad regulation of speech.

First, there are performers who by their nature do not draw a crowd and accordingly seek to be able to travel along the boardwalk during a single day. Under Chapter 62, however, they are limited to one designated area on the boardwalk. While, like in *Chase I*, this Court recognizes that limiting performances to the boardwalk's intersections with other city streets allows congested traffic the room to maneuver around stationary crowds, 825 F. Supp. 2d 599 at 620, *not all performers* draw the type of stationary crowds leading to public safety and congestion of traffic concerns.[26]

Second, assuming that Ocean City could still enforce the Monday through Thursday and Friday through Sunday restrictions, Ocean City has not attempted to offer *any* connection between the City's interests in public safety and crowd control and preventing a street performer from being able to change which spot he or she occupies from one day to the next. Rather, Ocean City asserts that requiring the designated areas to change was enacted because "numerous members of the public have commented on the need for a system that rotates performers. . . This portion of the Ordinance ensures that business owners, residents and visitors are not exposed to the same performer drawing a large crowd for extended periods of time . . .." (ECF No. 78-1 at 22.) There is not, however, a substantial government interest in meeting the public's desire for a "rotation system." There are performers who by their nature do not travel to seek an audience, but still wish to be able to

---

[26] Notably, this Court's ruling in *Chase I* on the preliminary injunction stated that "on the record presently before the Court, [the restriction on location] appears narrowly tailored" to the City's interests. 825 F. Supp. 2d at 620. At that time, the only street performer challenging the restriction and who testified at the preliminary injunction hearing was one of the current Plaintiffs, Mark Chase, and the case did not involve a facial challenge to the restriction's constitutionality.

vary their designated areas from day to day based on outside factors.[27] There is no justification for why performers who do in fact draw crowds are prohibited—or required—to change their locations from day to day.

Nor can Ocean City rely on an interest in preventing "conflicting claims for the available spaces" because the City has not offered evidence that there are actually territorial disputes among street performers. In *Dowd v. City of Los Angeles*, No. CV09-06731, 2013 WL 4039043 (C.D. Cal. Aug. 7, 2013), the United States District Court for the Central District of California discussed how a space allocation system on the Venice, California boardwalk was created to remedy the problem of conflicting claims for available space on the boardwalk. The court noted, however, that the ordinance contained the following, unchallenged findings:

> There were numerous altercations over the locations and amounts of space that any one person or organization could use. Frequently, the altercations became violent, requiring law enforcement response to preserve the public peace. Persons wishing to secure spaces often arrived prior to dawn . . . Unregulated, the Boardwalk became a place where only the strongest and earliest arrivals could secure space to exercise their rights of free expression without threat of intimidation. It is, therefore, necessary to regulate the use of the limited space on the Boardwalk to prevent conflicting claims for the space and to allocate the limited space available fairly to all who desire to use it for lawful purposes.

*Id.* at *8. Aside from generally citing "conflicting claims for the available spaces," there is little support that problems actually occur on the Ocean City boardwalk. On the other hand, Plaintiffs direct this Court to one reportable incident report for street performers in the

---

[27] For example, Plaintiff Bloom testified that during the summer on Wednesdays, Ocean City sponsors a band in an area close to a designated space. (ECF No. 79-12 at ¶ 27.) Accordingly, while that might be a space where he can perform his music in a given week on Monday and Tuesday, he cannot perform there on Wednesday.

summer of 2014 that lists ten incidents, none of which occurred among performers. (ECF No. 79-10.) Accordingly, the City has not provided "actual evidence" that such conflicts occur that necessitate assigning designated areas.[28] *See Reynolds*, 779 F.3d at 231 (explaining that in "the absence of evidence of a county-wide problem, the county-wide sweep of the Amended Ordinance burdens more speech than necessary").

### ii. Time limitation

Chapter 62 also states that performers may not engage in performing on the boardwalk between 1:00 a.m. and 10:00 a.m. § 62-10(k). Plaintiffs argue that the time restrictions are not narrowly tailored to further the City's interests. Ocean City asserts that "[a]t the Task Force hearings, members of the public discussed the annoyance and inconvenience experienced by various persons as a result of a performer[] playing hours into the night." (ECF No. 78-1 at 28.) Plaintiffs challenge this general statement by asserting that the City did not explain why noise ordinances are insufficient to alleviate the public's concerns, and further assert that the City has offered no justification for the precise start and stop times. (ECF No. 84 at 13-14.)

Beginning with the 10:00 a.m. restriction, Ocean City articulates no reason why street performers must wait until then to begin performing. This Court in *Chase I* has previously noted that the boardwalk draws its larger crowds later in the day. *See Chase I*, 825 F. Supp. 2d at 605 ("The crowds that street performers draw on the boardwalk vary considerably, but are significantly larger at night."); *see also* ECF No. 78-3 at 11 (Lieutenant Kovacs testifying that

---

[28] While there was some testimony during the task force hearings regarding street performers arriving on the boardwalk early to "claim" locations, ECF No. 78-3 at 8, 15, there is no testimony concerning *conflicts* among street performers for locations. Rather, Plaintiff Chase testified that street performers began arriving early because storeowners actually began placing items in their regular spots. (*Id.* at 16-17.)

during the patrol's 10 a.m. to 6 p.m. shifts, the personnel rarely encounter performers during the first third of their shift.). Nor "with a healthy dose of common sense" does this Court conclude that street performers cause problems with public safety or the free flow of pedestrian traffic—for example—after 8:00 a.m. that require a 10:00 a.m. start time. *Reynolds*, 779 F.3d at 229. Accordingly, the City has failed to show that prohibiting individuals from performing on the boardwalk before 10:00 a.m. is narrowly tailored to the interests of public safety and promoting the free flow of pedestrian traffic.

Unlike the morning 10:00 a.m. restriction, the nighttime 1:00 a.m. restriction is narrowly tailored to the City's interests. During the task force hearings, two members of the public expressed concerns about performers remaining on the boardwalk late into the night. (ECF No. 78-4 at 29, 32-33.) Further, in the interests of public safety and decreasing congestion on the boardwalk, 1:00 a.m. is a reasonable time restriction given that bars along the boardwalk are required to stop selling alcoholic beverages one hour later, at 2:00 a.m. Accordingly, "common sense and logic" dictate that prohibiting individuals from performing on the boardwalk past 1:00 a.m., regardless of the specific nature of their performance, is narrowly tailored to the interests of public safety and promoting the free flow of pedestrian traffic. *Reynolds*, 779 F.3d at 230.

### iii.    Miscellaneous restrictions

Having found that the regulations requiring registration and designating performance areas are facially unconstitutional, this Court now addresses the regulation that states: "[n]o

performer . . . shall place or allow any item exceeding six feet above ground . . .."[29] § 62-10(d). Plaintiffs only argue that this limitation would prohibit a performer over six feet tall from utilizing an umbrella. (ECF No. 79-1 at 54-55.) Section 62-10(d), however, has an exception for umbrellas. § 62-10(d) ("Performers and venders can utilize an umbrella for sun shade . . ..) Having raised no other argument, Plaintiffs have not shown how this restriction burdens their right to freedom of speech, and accordingly, this restriction is constitutional. *See Dowd v. City of Los Angeles*, No. CV09-06731, 2013 WL 4039043 (C.D. Cal. Aug. 7, 2013) (finding four-feet height restriction was not overly broad).

### C. Advertising restrictions

Finally, two provisions of Chapter 62 regulate advertising. First, if an individual utilizes an umbrella for shade from the sun, the umbrella may not include signage or advertising. § 62-10(d). Second, performers and venders may not "advertise, or employ an individual to advertise, his or her performance or vending outside of the designated space or street end area which the performer or vender occupies." § 62-10(o). As to the second restriction, performers are no longer restrained to designated performance areas and accordingly this restriction's derivative reference to "performer" is stricken as well. As to the first restriction, it appears to be a restriction on commercial speech and accordingly subject to intermediate scrutiny. *Chase I*, 825 F. Supp. 2d at 622 ("As an express regulation of advertising, this provision appears to be a restriction on commercial speech, subject to intermediate scrutiny."). Notably, Chapter 62 does not prohibit a performer from using an umbrella; it prohibits the placement of an advertisement on the umbrella. Ocean City "avers

---

[29] Plaintiffs do not appear to challenge the rest of this provision which also prohibits "affix[ing] props or equipment to the Boardwalk surface."

that the justification behind this regulation is to limit the collateral effects [that] widespread advertising could have on the Boardwalk." (ECF No. 83 at 12.) Ocean City has not offered any evidence, however, connecting the *placement of an advertisement* on an already existing umbrella to any such "collateral effects" or threats to the public safety or free flow of pedestrian traffic. In fact, this Court finds no reference to advertising anywhere in the eighty-seven page report from the Boardwalk Task Force. (ECF No. 78-5.) Accordingly, the City has not provided "actual evidence" that problems occur that necessitate this advertising restriction, and it is not a proper restriction on commercial speech.

### III.    Effect on Chapter 62's regulations of vendors and vending

The Code of the Town of Ocean City, Maryland, Chapter 62, Section 62-14 states that:

> If any portion, subsection, sentence, clause or phrase of this chapter is for any reason held by a court of competent jurisdiction to be invalid, such a decision shall not affect the validity of the remaining portions of this chapter. The City Council hereby declares that it would have passed this ordinance and each portion or subsection, sentence, clause and phrase herein, irrespective of the fact that any one of more portions, subsections, sentences, clauses or phrases be declared invalid.

As described *supra* note 1, Plaintiffs are all individuals who do or have performed on the Ocean City boardwalk. This Court's analysis depended on the fact that Plaintiffs engage or engaged in fully protected speech under the First Amendment. On the other hand, neither in their briefings nor at the hearing did the parties provide this Court with the information necessary to analyze the constitutionality of Chapter 62's regulation of vendors and vending. Accordingly, as described in this Court's Order, the references to "performer" and "performing" are STRICKEN from: Section 62-7, "Performing and vending in designated

spaces"; Section 62-8, "Allocation and selection of designated spaces"; Section 62-10(j)-(k), setting the 1:00 a.m. through 10:00 a.m. ban; and the portion of Section 62-10(d) which prohibits signage or advertising on an umbrella utilized by a performer. Further, the various derivative references to performers found in Section 62-10 are STRICKEN as well—namely the references to "performer" and "performing" in Sections 62-10(a)-(c), 62-10(f)-(i), and 62-10(o).

## CONCLUSION

This Court recognizes Ocean City's substantial interests in making the boardwalk safe and orderly for its citizens, personnel, and visitors. This Court also recognizes the efforts Ocean City put into enacting Chapter 62. However, with the exception of three provisions, Chapter 62's restrictions place a substantial burden on speech that does not implicate or hinder the City's interests. As this Court stated over twenty years ago in *Markowitz*, Ocean City must determine the forms of expressive activities that "*actually* harm or substantially threaten" the City's interests and "develop an ordinance which *directly addresses* the evil posed by each activity." No. MJG-95-1676 at 19-20 (emphasis added).

For the reasons stated below, this Court GRANTS IN PART and DENIES IN PART both Motions. The City's Motion for Summary Judgment (ECF No. 78) is PARTIALLY GRANTED and Ocean City may enforce three of the regulations that Plaintiffs challenge in the interests of public safety and decreasing congestion on the boardwalk: Ocean City may enforce the provisions of the Code of the Town of Ocean City, Maryland, Chapter 62, Boardwalk Performing and Vending which prohibit performing anywhere on the boardwalk after 1:00 a.m.; specifically prohibit performing at any time on

the street ends of North Division and Dorchester Streets; and further restrict the placing or allowing of an item exceeding six feet above the ground on the boardwalk. These three restrictions on "performers" and "performing" are FACIALLY CONSTITUTIONAL under the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights.

As to all other remaining regulations, the City's Motion for Summary Judgment (ECF No. 78) is DENIED and Plaintiffs' Motion for Summary Judgment (ECF No. 79) is PARTIALLY GRANTED. Ocean City may not enforce the remaining regulations that Plaintiffs challenge which, as enacted: require all performers wishing to perform between and including First South Street and Ninth Street to register for a designated area beginning one week ahead of time; require performers in the same stretch of the boardwalk to only occupy one of those designated areas and various related restrictions; ban performing before 10:00 a.m. on the entire boardwalk; and prohibit signage or advertising on umbrellas utilized by performers. These restrictions on "performer" and "performing" are FACIALLY UNCONSTITUTIONAL in violation of the First Amendment to the United States Constitution and Article 40 of the Maryland Declaration of Rights. The City shall not enforce these provisions as enacted.

Specifically, the references to "performer" and "performing" in these Sections of the Code of the Town of Ocean City, Maryland, Chapter 62, Boardwalk Performing and Vending—Section 62-7, "Performing and vending in the designated spaces"; Section 62-8, "Allocation and selection of designated spaces"; the portions of Sections 62-10(j)-(k) which prohibit performing before 10:00 a.m.; and the portion of Section 62-10(d) which prohibits

signage or advertising on an umbrella utilized by a performer—ARE FACIALLY UNCONSTITUTIONAL in violation of the First Amendment of the United States Constitution and Article 40 of the Maryland Declaration of Rights. Therefore, pursuant to the Severability Clause of Chapter 62, Section 62-14, the references to "performer" and "performing" are STRICKEN from the above provisions of Chapter 62. Accordingly, the various derivative references to performers found in Section 62-10 are STRICKEN as well—namely the references to "performer" and "performing" in Sections 62-10(a)-(c), 62-10(f)-(i), and 62-10(o).

A separate order follows.

Dated: May 9, 2018

_____/s/_____

Richard D. Bennett
United States District Judge